Titan Tire Corporation and Dico Inc. This is an appeal from a bench trial in an environmental case under CERCLA and the primary question on appeal, which I'll be spending most of my time on, is whether Titan Tire and or Dico can be held liable as arrangers under CERCLA by virtue of Dico's arm's-length sale of buildings to a third party in 2007 for the total price of $160,000. We submit that the district court's decision holding Titan Tire and Dico liable as arrangers represents the broadest expansion of CERCLA arranger liability since the United States Supreme Court decided Burlington Northern in 2009. And I don't say that lightly, but in the government's brief, the government cites no cases subsequent to Burlington Northern or even before Burlington Northern with circumstances that are even remotely close to those present here and where a court held arranger liability to exist. The buildings that were at issue in the transactions here, and I know the court is aware of this, this is the second time now this case has reached this court, the buildings at issue were Butler-style buildings, which are prefabricated steel structures that can be disassembled and reassembled somewhere else with relative ease. Basically you have an infrastructure of hundreds of beams that are put together almost like tinker toys and you can take them down and put them back up and put walls and a roof over the building. We know, and it's undisputed, that these buildings have commercial value because Sim, the third-party, the buyer, Southern Iowa Mechanical, bought one of these buildings from Dico, from the Dico site, in 2004 and took the beams back to its property in Ottumwa, Iowa and reconstructed the building. And that building, even at the time of trial in this case, in 2017, was still a very functional, very useful building for Sim. So we know that these buildings were useful because there was a clear track record amongst these very parties of having used them. But if you break into some encapsulation, it makes it bad, right? Well, here's the issue. The buildings in the mid-1990s were found to have PCBs inside the insulation and that was the contamination that EPA had found and that led to some of the remedial activity on the site. But the only thing that Sim took back to its site was the the most useful part of the buildings, which were these steel beams. And nobody expected those steel beams, even in 2007, to have any contamination. EPA's own project manager, who'd had responsibility for the site for years, said that when EPA ended up sampling the Sim site and sampling the beams on the site, she said they very much expected to find clean beams. They expected to give, in her words, a clean bill of health to Sim to be able to use the beams exactly the way he had purchased. But didn't they qualify that by saying because they expected that they would have What she said was she expected the insulation to have been removed more neatly. But that ultimately was something that Sim had control over, not my clients. But isn't this, I mean, aren't you pushing a big boulder uphill? I mean, Chet Pratt says you have an order that you're supposed to tell the EPA before you do anything. You don't do that. You don't tell Sim that there's contamination and Sim says we would have never bought it if we'd contaminated. You don't properly dispose of the material. You know that there's this PCP insulation flying all over the site because you're watching them take it down. I mean, those are all facts that seem to me make a pretty compelling argument that you wanted to get rid of a bad building. Well, first of all, I don't think any court has ever held that knowledge and failure to tell the EPA. And you would sign an agreement saying, EPA, if we disassemble this building, we'll tell you beforehand. And so that, I mean, it isn't just one fact. I mean, you're trying to cherry pick, well, there's just this fact. We didn't tell them. Or there's this fact. Judge Pratt said there's 10 facts and you read them all together and it makes a pretty compelling argument that you knew exactly what you're doing. You want to get rid of a bad building. A couple of responses. First, it's important to remember that my clients actually invited EPA to the site at exactly the time that the building removal activity was taking place. So if this was some sort of disposal by subterfuge, which is essentially what the district court found, it doesn't make any sense that my clients would have invited EPA there to see it. It's also important to remember that there was a lot of turnover among the environmental staff at DICO and the years leading up to this contamination. So the people who were around at the time this commitment had been made to EPA to provide notice, by and large, had been replaced by other people as of 2005, 2006, 2007. And those new people, the new environmental consultants, when they were having internal conversations about these transactions, and there are contemporaneous notes that the government itself has relied on, in those contemporaneous notes, there is absolutely no discussion of this being a disguised disposal of hazardous waste. There's no discussion of these transactions being anything other than a sale of buildings. Well if it was just a garden variety sale of the building, why didn't you tell the buyer it was contaminated? For essentially the same reason. It's not clear that the people who are communicating with the buyer even knew of the contamination, but even accepting that they did, again I'll go back to the case law in this area, no case has held that failure to disclose in and of itself is sufficient to create a ranger liability. And I'll give a couple of examples. There was a case that this court cited favorably in its December of 2015 opinion called Sheovone. It was a District of Connecticut case. The defendant in that case was presumed to have known of the presence of PCBs in used transformers that were sold. The defendant did not disclose the existence of those PCBs to the buyer. In fact there was no discussion of PCBs at all during the transactions, and yet the court held as a matter of law on a motion for summary judgment that there was no arranger liability because the larger context of the transactions made clear that these were commercially legitimate transactions. Team Enterprises is a Ninth Circuit case that I would argue is an even more egregious example of deficiency or failure on the part of a seller to provide helpful information to a buyer with respect to hazardous substances. In that case there was a sale of dry-cleaning equipment and the seller included an instruction manual that specifically told the buyer how to dispose of waste water. And the buyer did what it was told in the instruction manual and that led directly to the contamination that the buyer later had to clean up. So the seller literally hadn't failed to disclose something that the seller literally had misguided the buyer as to how the hazardous substances should be disposed, and yet the court still held as a matter of law on summary judgment that there was no arranger liability because of the larger context of the transactions. So if the seller isn't liable even when it misguides the buyer as to how these things should be disposed of, then we would argue certainly there shouldn't be any liability where there's no the only thing that the district court relied on was knowledge? I would say that knowledge and failure to disclose were certainly the primary thrust of the district court's opinion. And I know there was a lot of factual discussion, but just about all of it came back to one or the other of those two things, either knowledge or failure to disclose. So are you asking us to disregard all of the other factors that the district court considered in determining this, the value of the beams and the costs that were avoided, the plans that DICO had for wanting to develop, all of those factors, are you saying that those are so de minimis that we should just ignore them? No, certainly not. And instead, a big part of what we're arguing is that the district court misunderstood and misapplied this court's opinion from December of 2015 when it tried to apply those facts. And I'll give a couple of examples in that respect. One of the issues, and this court identified a whole host of factors for the district court to consider, but there were two that this court placed particular emphasis on. The first was whether or not the buildings were commercially useful. The district court had concluded or tried to conclude as a matter of law that these buildings were commercially useless. There was no general demand for buildings of this type, and therefore it couldn't possibly have been anything other than a ploy to get rid of hazardous substances. By the time we went back and had a trial, the district court had completely reversed itself and recognized and found, as a matter of fact, that there was general demand for buildings of this type and that there was a market for used Butler style buildings. They did have value. The government's own expert witness admitted that. He said that if he was advising somebody in a building demolition situation, he would insist that the buyer of that property make sure to get sufficient value for used Butler style buildings. These things absolutely have value. And so that factor, even though it was important to this court in its December of 2015 opinion, and I mean that literally, the court used the word important to describe it, even though it was important to this court, Judge Pratt ended up giving it only a little bit of weight or finding that it weighed only slightly in favor of the legitimacy of the transaction. So we argue that he did not give sufficient weight to that factor, which this court found to be important. Didn't he also find, though, that that Simms said they wouldn't have bought it if they had known it was contaminated? And so that that gave that factor less weight? That's why he did that, but again we believe that's legal error and a misapplication of what this court instructed the district court to do. Why is it legal error for him to make a factual finding that they wouldn't have bought it if they'd known it was contaminated? A couple of reasons. First of all, Simms actually learned of the contamination in January of 2008 and continued paying for the buildings even after that. And in fact, in May of 2008, after EPA had been at the Simms site to sample the buildings, a week later Simms signed an amendment to the contract agreeing to pay even more for the from 2017 in the context of what the parties were actually doing at the time of the transactions. What was that additional dollar amount for? Why was that added to the contract? It was about $5,000 and it was to reflect certain, I can't remember if it was disposal or permitting costs, something, some additional costs that had been incurred as part of the removal process that was then passed along to Simms. So I don't mean to suggest that the existence of the contamination made the buildings more valuable. I just mean that even after learning of the contamination, Simms still was willing and interested to complete the transaction and pay more money. And the district court did find that there is resale value here, but I understood it also to consider the fact that DICO never advertised and never looked for really anyone beyond one person who then rolled over to Simms, to that seemed to be a factor that played into the district court's assessment of value. It did, but again it needs to be looked at in context. We have a situation where this 2004 transaction between the same parties serves as an awfully good benchmark of what a legitimate transaction would look like between these parties and involving products of this type. In other words, the government admits the 2004 transaction was legitimate. Everything that happened in the 2007 transaction, the negotiation process, the presence or absence of general advertising, everything that happened was identical to what had happened in 2004. So if 2004 was legitimate, it becomes harder to argue that 2007 was it. Or as the district court I think pointed out, maybe that's all right, we know that Hughes is going to buy this. We got the 2004 purchase. So I mean just taking the other side of the coin, the other way to look at it is that I think part of it, the district court's findings were that they were confident Hughes was not going to ask any questions, and so if they didn't offer it up, look this has gone through before in 2004 and let's move it on. So couldn't you see, couldn't, isn't it legitimate for the district court to make that factual finding? I agree that that's what the district court did, but that gets to the larger point about the law in this area. At some point if there is a sufficient level of commercial legitimacy in these transactions, the case law seems to recognize that courts shouldn't go beyond that and and try to spin everything to make it look suspicious. And our argument here, the core of our argument here, is that what the district court did was take a transaction where Sim paid my clients $160,000 for these buildings. It wasn't like we paid them to get rid of them. And there was an arm's-length negotiation where my clients actually rejected Sim's first offer as being too low in 2007 and said no, you need to come back and do better. And my clients did in fact talk to a different potential buyer before those negotiations fell through. So there are plenty of indicia of commercial legitimacy here. And in that context, district courts shouldn't be allowed to come in, particularly with the benefit of hindsight, and say well that was just part of you being sneaky. That type of speculation and innuendo under the existing case law simply shouldn't be a basis for finding a ranger liability. And the consolidation Cole case from the Fourth Circuit recognizes that. There are other cases that we cited in our briefs as well that recognize, generally as a matter of law, subject to de novo review, that once you've got a sufficient level of commercial legitimacy, that's it. The inquiry ends and you can't look behind it. And the risk of holding any other way is this. In all of these transactions, by definition, if you've got an arranger liability case, you have ended up in a situation where there is some tremendously expensive environmental liability that has come into existence. And it becomes a fight about who's going to have to pay for it. If you're allowed to come in after the fact and say, well in retrospect, what the seller did looks sneaky or looks like an attempt to avoid environmental liability, pretty soon everybody who sells a useful product is going to be liable under surplus as an arranger, just because of what ended up happening, as opposed to what the parties intended at the time. And that's clearly not permissible under Burlington Northern and the other cases. So I will reserve the remainder of my time for rebuttal. You may. Ms. Hanson-Young. And the lectern would lower, too, on the right. Good morning, Your Honors. May it please the Court. My name is Tekla Hanson-Young and I represent the United States. This case is not a case where a seller sells a new and useful product like the Ninth Circuit decided in Team Enterprises, nor is it a case where there's no evidence of intent, like the Chavon or Constellation Coal cases that my friend cited to in his opening remarks. Rather, there was copious evidence of intent that the district court documented after a trial in its extremely thorough 109-page decision. And that court's decision, and in particular its factual findings, are reviewed under the very deferential clear error standard that this court has particularly identified in one of its decisions, Gurley, at 43 F. 3rd at 1194, specifically applying in cases in reviewing factual findings. I'd also like to just note that in assessing whether there is intent, this court has made clear that whether a product is useful is not a dispositive factor, as my friend suggested is. Rather, it is one factor that a court would look at in determining whether a seller intended to dispose of something, you know, through a sale. Whether that product is useful is just one factor among many others that a court would consider. And the record shows that the district court considered that and found that it was only slightly weighed in favor of a finding that there was no intent, whereas all of the other factors that the district court considered weighed strongly in favor of a finding that DICO and Titan intended to dispose of PCBs through their sale to Sim. And most notably, those facts include not only the fact that DICO and Titan knew that the buildings contained PCBs, and in fact this court found as a matter of law in affirming civil penalties in its 2015 decision at page 353 that there was no reasonable way that DICO or Titan could have known that there were no PCBs in the buildings. But the district court also found it at page 18 and at 79 to 81 of its decision that the defendants knew of the PCBs and knew that the buildings were subject to an EPA order. The site is a Superfund site, subject to not only that order but other orders. And to try to characterize the sale of these contaminated buildings as similar to the transformers is simply, there's no comparison. The district court also considered the fact that the value of the buildings sold to Sim were substantially less than the cost of the remediation that the company sought to avoid. Specifically, the court found that the cost of remediation were close to calculate, didn't even include all of the costs, and it was also not adjusted for inflation. It was set in 1996 dollars, whereas the cost of the buildings themselves were a mere $118,000. Was the cost avoided figure mostly relied, did the district court mostly rely on the feasibility study to determine the cost avoided? That's correct, the 1996 feasibility study, which it also found had been provided to DICO and Titan, and Titan and DICO were aware of the magnitude of those costs, and the discussion of that is found at page 88, specifically and generally at 85 to 95 of the district court's decision. Counsel, would this be the broadest imposition of circular liability for an arranger in the history of the country, or at least since Burlington Northern? No, I don't think that's true. I think that this court could look to the First General Electric case, which is found at 670 F 3rd 377, where GE was found liable after a trial, similar to the case here, for selling unwanted scrap material to another company or another individual who was using that scrap material as an additive in his paint manufacturing process. Again, as similar to the case here, there was a trial, there was evidence of intent, evidence that GE couldn't find other buyers or other ways to dispose of the materials that it didn't want, and that's quite similar to the case here, where, as was noted earlier, DICO and Titan didn't advertise the buildings for sale, didn't try to obtain the highest price for the buildings, and in fact concealed the fact that the notable fact that the district court found was that, though DICO and Titan had specifically told Sim there was no asbestos in the buildings and warned Sim not to pierce the asphalt cap at the site, they did not tell Sim that there were PCBs in the building, and in fact continued to hide that information from Sim after EPA had visited the site, after the current environmental consultants had received the previous orders from EPA and were informed by EPA that they were concerned about the PCBs specifically. DICO and Titan both withheld information from EPA about who had purchased the buildings and also did not tell Sim that there were PCBs until DICO and Titan found out that one of Sim's employees had brought contaminated insulation to their own home. Is the General Electric case in your brief? I'm not sure that it's in my brief. What's the title? Do you know the style of the case, the title of the case? Yes, it is, I have it here, it's United States versus General Electric Company, and that's at 670 F3rd 377, First Circuit from 2012, and I believe it's discussed in this court's 2015 decision. I was going to ask, well, I have a couple questions. One is, can you clarify for me the state of the record relative to the disposal of the material? It was taken to the Des Moines landfill, as I understand, and was not disposed of as any type of hazard, it was just general construction material. Would they have been required to get a permit had the landfill known what the material was, or would they have tested it, or what would have happened had the landfill been told that it was potentially hazardous? Well, the landfill would not have accepted the material, and what EPA specifically provided to DICO and Titan as late as 2007 was a reuse report stating that any demolition of the buildings would have to be supervised by EPA, and previous documents provided by EPA in the form of the 1996 feasibility study also had informed DICO and Titan that demolition or remediation of the buildings and the waste would have been expensive and required special treatment in the form of disposal at a certified landfill. But I thought that Mr. Loker's brief indicated that there was some evidence that the landfill would have accepted it and would not have required a special permit. There was, and DICO and Titan put that in at trial, and the district court considered it and rejected it specifically, and it did so at I think around page 100 of the district court's decision, and the courts, or maybe in the 90s, the court specifically found that EPA had the authority to direct how the PCBs would have been disposed of. That's different from the question I'm asking. I understand, and obviously that's powerful evidence for your position that you had told DICO that they had to consult with EPA before they did demolition, and they didn't. But just on the narrow question of whether Des Moines landfill would have required a special permit, I understand there was . . . Did Judge Pratt make a specific factual finding on that? It is my recollection that he did, and I can try to find the precise page. That's okay. I'll find it. Okay. The other question I have is, you've repeatedly referenced DICO slash Titan. What is your argument that allows you to assess whatever liability is applicable here to Titan and not just DICO? Now, you're asking about the response costs as opposed to the enforcement costs, or on both issues? Both. With respect to the response costs, the EPA argued and the district court found that Titan, although it didn't own the PCBs, was in possession of the PCBs, and that's all that's required under the statute. The reason why Titan was considered to be in possession of the PCBs is because it directed the operations at Titan, and the district court made numerous factual findings about the control that Titan executives and officers exercised over DICO's operations, and the fact that DICO's president had authorized William Campbell, for example, to make decisions concerning the disposal of the buildings, specifically. A lot of the employees who acted on behalf of DICO were actually Titan employees. Sherry Hawley, for example, was a general counsel of both. The environmental consultants were hired specifically by Titan to do the work at DICO. So based on all of these facts that were submitted to the court, the court found it was appropriate. Titan had, in fact, possessed the PCBs and could be held liable for the response costs. Now, as to your question about whether Titan or DICO also could be liable for the consequences that EPA incurred in pursuing the civil penalties and punitive damages claim against DICO, it is equally appropriate to hold Titan liable for those enforcement costs because, one, as an initial matter, the argument has been waived, and the district court found that the argument was waived in its decision at docket number 298. Secondly, even if the defendant's burden in a CERCLA case to prove that the harm is divisible and that there's a reasonable basis for allocation of different costs, the harm here is not divisible. It arises from the same set of facts, Titan controlling the disposal of the PCBs, and it also is not apportionable because the EPA incurred the costs pursuing the same factual claims against DICO. And one example of why the costs are not apportionable, and I realize that DICO and Titan make this argument in their brief that, well, you could just eliminate the costs out for the certain period of time when the United States was litigating the civil penalties and punitive damages portions only. Well, it's not appropriate to do that because in the 2016 trial, both DICO and Titan relied on and the parties submitted testimony that was developed in the 2014 trial to use in the 2016 trial, and that's referenced in page 8 of the district court's decision. The district court allowed, admitted the testimony that was previously developed during the time that Titan says it wasn't responsible for those costs. So for Titan to say that all of the litigation that occurred during that period is not attributable to it or that it didn't benefit from that litigation or didn't rely on what was done during that time is belied by the record. It's not supported there. And Titan and DICO and Titan specifically haven't met their burden of showing that the harm is divisible or that the costs can be allocated. And I would also suggest that if the court found any question on this, it would be appropriate to remand to the district court on that issue to make specific findings because the district court is in the best position to decide how the litigation at any particular time served a different claim. I'm not sure if you were also questioning whether there's a statutory basis for the recovery of enforcement costs. To some extent because I wasn't, but they've also raised that issue. Sure. So I think the easiest way for the court to resolve that claim is to look, aside from the waiver issue, which we've discussed thoroughly in our briefs in which the district court adopted in its decision at docket number 298. But the easiest way for the court to address that issue if it decides to reach it on the merits is to look to the statute's language itself. The statute at 9601, 23, and 25 define removal actions to include all enforcement activities related thereto. And in 9607A, 4, provide that the United States can recover all costs of its removal actions. So courts have interpreted that to mean that the all of its enforcement costs that it incurs in pursuing its removal actions, which would be here specifically pursuing the enforcement action of the 1994 order. And another place that this court can look is in 9606B, the provision that makes clear that the availability of fines can only be pursued in an enforcement action, in an action to enforce an order issued by EPA. So both the plain language of the statute make clear that the recovery of all costs includes enforcement costs. And this court has previously found in an earlier 2003 DICO decision that attorney's fees are properly considered enforcement costs. I'm sorry, 2001 DICO decision, I misspoke there. And also in this court's decision in the Gurley case, this court found that just like to briefly point out, just address a couple of the factual issues that were raised by my friend in his opening remarks. He sort of said, well, the fact that Sim purchased the buildings at the same price as the well shop building in the earlier purchase sort of shows that it was all sort of the same type of transaction. And again, as the district court found, selling it at the same price just simply suggests that the defendants withheld relevant information from Sim. And I think more broadly, the easiest or simplest way for this court to resolve the case is to affirm the district court's judgment on the basis that its factual findings were supported by the evidence that it received at trial. And really, although DICO and Titan wish that the court had drawn different inferences from these facts, the facts support the inferences that the district court found. And under the clearly erroneous standard, this court should affirm the district court's findings. Does the court have any questions or would the court like me to address the punitive damages issue? I see no questions from here. Okay. Well, with that, I would submit the rest of the case on the briefs and ask that this court affirm the district court's judgment. Thank you for the argument. Thank you. Mr. Locher. Thank you, Your Honor. May it please the court. Let me address the First Circuit's decision in General Electric. That case involved scrap pyranol, and it was essentially undisputed that it was viewed as scrap by everybody involved in the transaction, including the seller. There was no general market for scrap pyranol. The buyer's use of that product was described as idiosyncratic to the buyer. And perhaps most importantly of all, General Electric continued shipping the stuff to the buyer even after the buyer stopped paying and later decided to forgive the buyer's debt rather than going and retrieving the stuff and bringing it back. So I would submit that General Electric absolutely is not as, excuse me, absolutely is not as expansive as this case would be if it is affirmed in terms of the scope of arranger liability. One of the issues in General Electric which ties into an issue here is that the seller in that case, General Electric, specifically crunched the numbers and evaluated whether it was cheaper to leave the stuff with the buyer or whether they should go pick it up and decided it was cheaper just to leave it there. There's absolutely no evidence of any sort of analysis like that taking place here, and that's another illustration of the legal error we believe the district court made when it evaluated costs avoided versus value received. There's no evidence that anyone at DICO sat down and crunched the numbers and said, geez, we're better off doing one thing as opposed to another with these buildings. Instead, what the district court did was rely on this 1996 feasibility study to try and estimate the costs avoided. By the feasibility study's own terms, it was outdated by 2007. It said the actual remediation costs are going to have to be evaluated at the time of remedial action, not based on conditions as they existed in 1996. There were huge differences between 1996 and 2007 in terms of regulations applicable to the disposal of insulation containing PCBs. To that end, the reuse assessment report, Judge Malloy, to get to your question, is an incredibly important document. What EPA said in that document, which was from March of 2007, was that one of the cheapest ways to dispose of insulation would be if the Iowa Department of Natural Resources would allow it to be disposed of at the local municipal landfill as opposed to being sent off to an expensive TSCA-certified facility. An Iowa DNR employee testified at this trial in 2017. He had been in a similar position in 2007. He said Iowa DNR absolutely would have allowed this insulation to be disposed of at the regular landfill, which is exactly where Sim ended up taking. The district court basically threw out that evidence and said, well, EPA testified at this trial in 2017 that it would have overridden any judgment of Iowa DNR. Therefore, I'm going to conclude that EPA, even though in the March of 2007 assessment report said Iowa DNR will get to decide, by 2017, they testified that, no, actually, they wouldn't have allowed Iowa DNR to decide, and so, therefore, I'm going to use this much higher cost-avoided number. Here's the problem with that approach. Intent has to be evaluated at the time of the transaction, not with the benefit of hindsight. At the time of the transaction in 2007, the best available information that the parties would have had would have been that Iowa DNR was going to allow this that Sim disposed of it. Did they know that in 2007? You said that that was their intent. Had they checked with the Iowa DNR? They hadn't checked, but that, to me, is actually more evidence of the legitimacy of the transaction because if nobody was talking about the costs of remediation at the time of the transaction, that's pretty good evidence that it just wasn't a factor in the transaction. Other courts have that that simply wasn't a factor and shouldn't be given any weight in any particular direction, and I see that our time is up. For all the reasons that I've stated today and in our briefs, we would ask that this court reverse in full the district court's ruling. Thank you. Counsel, thank you for the argument. Case number 17-3462 is submitted for decision by the court. The court will be in